IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL CASE NO. |
| VERNON ROMEO SPEAR | : | 1:13-CR-00432-WBH-JSA |

## <u>REPORT AND RECOMMENDATION</u>

The Defendant having previously been found incompetent to stand trial by order of the District Judge [81], the case is back before the undersigned on the question of whether Defendant's competency has been restored.  The undersigned convened an evidentiary hearing on September 2, 2016 [103], for which a transcript has been prepared [105] [106], and the parties have submitted post-hearing briefs [109] [110] [115] [116].  After consideration of the evidence, the undersigned concludes that the Government has demonstrated after competency restoration therapy and evaluation that Defendant is now **COMPETENT** to stand trial.

## BACKGROUND

### A.     **Prior Competency Proceedings**

The Court assumes familiarity with the lengthy background of this case that ultimately led to the District Judge's finding of incompetency on November 2, 2015 [81].  The undersigned will nevertheless offer a brief summary to assist in

establishing the context for this Report and Recommendation.

Defendant was initially evaluated by a psychologist employed by the U.S. Bureau of Prisons (Dr. Boutwell) and a psychiatrist retained by the defense (Dr. Dorney). Defendant suffers from schizophrenia and borderline intellectual functioning, although the experts were in agreement that his schizophrenia was generally well controlled and was not in itself a ground of incompetency. Rather, the experts were primarily concerned with whether Defendant could rationally assess the evidence against him and assist his lawyer with his defense in light of his cognitive limitations. Both of the experts initially opined that Defendant was competent to stand trial, although they both recommended that any trial include accommodations such as a slower pace and more frequent breaks. Dr. Dorney changed her opinion by the time of the evidentiary hearing, by which time she declared the Defendant to be incompetent as a result of his cognitive limitations. The undersigned assigned less weight to that changed opinion for reasons stated in the initial Report and Recommendation [78], and as discussed again further below. Thus, the undersigned recommended that the Defendant be found competent to stand trial, subject to the furnishment of accommodations such as slower pace and more frequent breaks. *Id.*

The District Judge declined to adopt the recommendation, and found Defendant to be incompetent, because:

> The question of whether a defendant is competent to stand trial is based on a regular or normal trial that proceeds at a regular or normal pace. Granting accommodations to slow the pace of proceedings to try to explain the meaning of legal phrases is simply acknowledging that Defendant is not competent.

[81] at 4.  Thus, the District Judge thus designated the Defendant for hospitalization and remanded the matter to the undersigned for a determination as to whether competency could be restored and to recommend an appropriate disposition.

### B.    The Restoration Hearing

The Defendant was hospitalized at the Bureau of Prisons for purposes of evaluation and treatment from January 7, 2016 through June 6, 2016, and was under the supervision of Dr. Lea Ann Preston Baecht.  (Gov't Ex. 1 at 1; Tr. [106] at 6).  For approximately two of these months, however, the Defendant was in lock-down status because of a disciplinary incident.  (Tr. [106] at 49).[1]

Defendant was administered the WAIS-IV comprehensive intelligence test. He scored a full scale IQ of 68, although that translates into a likely range of a true

---

[1] The Defendant apparently was found to have exposed himself in front of an employee.  Dr. Preston Baecht testified that Defendant coherently represented himself during the disciplinary hearing, and answered questions relevantly.  *Id.* at 12-14.  While in lockdown, Defendant also wrote letters to Dr. Preston Baecht complaining that other inmates were released from lock-down earlier, and that his long stint in lock-down was unfair given his lack of any history of disciplinary problems.  *See id.* at 26-27.

IQ between 63 and 73.  *Id.* at 22.  In terms of the component tests, he scored a

verbal comprehension score of 68, a perceptual reasoning score of 77, a working

memory score of 71 and a processing speed score of 71.  *Id.* at 21-22.  These

scores corresponding to someone operating at the "cusp" of the boundary between

having an intellectual disability (formerly referred to as mental retardation) and

being at the low end of borderline intellectual functioning.  *Id.* at 22.  Defendant,

however, has not been diagnosed with an intellectual disability and is likely at the

far low end of what is considered borderline intellectual functioning.  *Id.* at 22-23.

Defendant's treatment and evaluation involved formal interviews,

psychological testing, and weekly participation in an hour-long program referred

to as the "competency restoration group."  Tr. [106] at 6, 15, 35.  The purpose of

this program–which lasted nine weeks–was to help educate the participants in the

court system and evaluate their level of understanding.  *Id.* at 16.  The program

does not discuss the evidence in any of the participants' cases specifically, and is

not designed to evaluate a participant's "ability to abstractly think about their

specific case details."  *Id.* at 60.  Typically, the sessions involved lectures, oral

questions answered by participants, handouts, and worksheets filled out by

participants.  *See id.* at 15-16, 19.

Defendant was considered the "star pupil" in the competency restoration

group.  *Id.* at 33.  "He was the one that always volunteered to read the items,

provided the correct responses, elaborated on other responses." *Id.* at 33. Generally, Defendant functioned at a higher level than other participants, even including those without intellectual disabilities. *Id.* at 38. For example, when asked when it would be appropriate to consider entering a plea of guilty, Defendant responded to the effect that "[w]hen there is alot of evidence or witnesses" against someone, that defendant "would be better off to plead guilty because they would get a lighter sentence." *Id.* at 20. Similarly, when asked when pleading no contest would make sense, Defendant responded that such a decision would make sense when trying to avoid liability in a civil lawsuit. *Id.* Typically, Defendant scored 100% on the worksheets. *Id.* at 19.

Dr. Preston Baecht testified to an interview in which she discussed Defendant's case with him. Defendant asserted his innocence and explained that he needed to "poke holes" in the Government's case. As the expert summarized Defendant's theory:

> What Defendant asserted was that the gun had been found in a trashcan
> and that they were saying it was his gun but that it was not and that they
> would somehow have to prove that he was the one that threw it in the
> trashcan. He wasn't aware of it having fingerprints on it. He did
> mention inconsistencies in the police report. And to him that was
> important. Whether or not the amount of importance he placed upon it
> was entirely accurate, I don't know. But . . . his overall contention was
> that he was innocent and that he needed to poke holes in the police
> reports to show that there were problems with those reports and,
> therefore, they couldn't be relied upon as being valid.

*Id.* at 29, 46.  As Dr. Preston Baecht put it, "[m]y sense in talking to him was that he was very motivated to be found not guilty and that he was looking at any little inconsistency that he could find to try to show that the police officers were lying." *Id.* at 68-69.  Dr. Preston Baecht ultimately opined based on Defendant's performance in the competency restoration groups and other interactions with him that he is competent to stand trial and that he needs no accommodations as to the pace of the trial or as to an other issues.  Gov't Ex. 1 at 14.

In the meantime, Defendant filed a *Pro Se* Motion for Ineffective Assistance of Counsel on August 15, 2016 [101].  In this difficult to comprehend filing, the Defendant appears to complain that his lawyer has misused or misunderstood the significance of key evidence in the case, including the police report.  Among various arguments, he appears to argue that his Constitutional rights were violated when the officers testified contrary to the police report at the suppression hearing, and that his lawyer has either acquiesced with this violation or has not been effective in asserting it.  He also draws significance from the fact that no gun or ammunition was presented in evidence during the suppression hearing.  These statements are apparently also similar to a bar complaint that Defendant has filed against his attorney.

Prior to the September 2, 2016 evidentiary hearing, the Defendant met for approximately 1.5 hours again with Dr. Dorney.  Dr. Dorney testified that

Defendant's flexibility in thinking and tendency to fixate or perseverate on particular facts was even worse than when she had evaluated him in 2014. Tr. [105] at 153. When she asked him about some of the concerns he raised in his bar complaint or *pro se* motion, the Defendant kept "going around this loop" in his head, where he would continually repeat various points, and he would "rambl[e] about the police report being set in stone, you can't amend it, you can't change it," and "that's what the constitution says." *Id.* at 147-148. According to Dr. Dorney, "we really could never get away from that," and the Defendant was never able to explain the significance or make any conclusions from these points. *Id.* at 157-171.

As Dr. Dorney explained:

> I think he really didn't understand the purpose of a police report, the fact, the purpose of what witnesses can and can't do. I don't think he understands that. So I don't think he was delusional about the police report. We've actually gone through the police report so many times. He's about to talk about the detail on the police report. But he can't take that information and extrapolate out to any kind of discussion with me about, you know, could a witness testify differently, could – did the officers report something differently than what's on the police report. No. That the constitution doesn't allow that. He can't really have any kind of discussion about that.

Tr. [105] at 149.

The Defendant also adduced testimony from forensic psychologist Dr. Amanda Flores, who previously assessed Defendant as competent during earlier unrelated state prosecutions while working at Georgia Regional Hospital. Dr.

Flores, now in private practice, evaluated Defendant again for the defense shortly before the September 2016 hearing.  *Id.* at 74.  Dr. Flores did not, however, undertake a "full competency evaluation" in this case.  *Id.*

Dr. Flores administered the MacArthur competency test.  According to Dr. Flores, "[h]e did very well in the pieces that have to do with the court system and knowing the role of the – of your attorney and stuff.  It's the appreciation piece where he really – I think I told you he bombed it.  He did very poorly in there."  *Id.* at 74-75.  According to Dr. Flores:

> The appreciation consists of a set of questions in which he's asked specifically about his case and whether he is -- for example, compared to other defendants with similar charges, is he more likely, less likely, or just as likely to be convicted.
>
> And so you ask that question, and then you get the answer.  And then regardless of what the answer is, you look at what is the reasoning for why they believe this. And his reasoning went back to observations that I had made throughout the evaluation of some repetitive themes . . .
>
> I definitely saw some problems with him actually appreciating the weight of the evidence against him and what could be a reasonable versus a not really logical defense.

*Id.* at 75.

Based on these and other tests that Dr. Flores administered during her evaluation, she observed "very clear deficits in what we call executive functioning."  *Id.* at 80.  Dr. Flores's described Defendant's ability to think, reason and communicate as follows:

And it was at times difficult for me to follow his thinking because it sort of seemed to loop around. And sometimes he wouldn't really complete the thought, and it would go right back to the issue with Officer Marr and how he had testified in front of the grand jury and how that was different from what was in the investigation report. And then he also brought up -- this is all within the first half hour.

Then we revisited this for another three hours. Then he also brought up issues such as Officer Hollis, who was a female officer that was brought in by Officer Marr to assist -- how she never provided a statement, how she did not testify. He also spoke about -- and this is all happening, and I'm having a hard time following him because he's going from one to the other. He also talked about the suppression hearing that was held. And he was very focused on the fact that the -- even though this was in a hearing to suppress some evidence in his case, he was focused on the fact that the gun was not physically there, the ammunition was not physically there. Later on when I asked him -- because he was so focused on it, and it was not making sense to me -- logical sense for why that would matter in terms of helping him.

*Id.* at 83-84.

Throughout this time, Dr. Flores explained that the Defendant could not rationally explain how any of these facts would change the outcome in the case, and "[i]nstead of answering the question, he immediately went to his constitutional right was violated. You cannot change an investigation report once I sign it. Detective Marr testified to some stuff or I think there was some discrepancies between -- he mentioned 375 Auburn Avenue, credit union, and a park and how the fact that those are in some piece of evidence but not in another -- how that is a problem. That is where he took me when I asked him." *Id.* at 84. According to Flores, during the 3.5 hours she spent with him, the Defendant kept coming back in

a "loop" to repeating the same points, including that under the Georgia Constitution, a police report can never be altered, and no testimony can be offered beyond what is specifically stated in that police report. *Id.* at 85, 88. Dr. Flores explained that Defendant is perseverating, or suffering from fixed thinking, on these "same three things over and over again." *Id.* "[I]t was very what we call perseverative. You get stuck. My impression at this point is it is fixed; that it isn't something that is amenable to change. Again, I think it goes because there are what we call executive functioning problems with Mr. Spear's thought process." *Id.* at 88-89. Dr. Flores did not perceive such a limitation in Defendant's thought process when she last evaluated him in 2003 and 2004. *Id.*

## DISCUSSION

"The legal test for competency is whether the defendant ha[s] 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he ha[s] 'a rational as well as factual understanding of the proceedings against him." *United States v. Nickels*, 324 F.3d 1250, 1252 (11th Cir.2003) (per curiam) (*citing United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir.1986)).

Applying these standards, as noted above, the District Judge previously found the Defendant to be incompetent to stand trial. *See* Order [81]. This finding was based, however, on expert testimony and a legal recommendation from the

undersigned, stating that although Defendant was otherwise competent, a slower pace of trial and other accommodations were necessary for the Defendant.  The District Judge found that the need to provide such accommodations was itself evidence of incompetence, and that the weight of the evidence presented at the initial hearing therefore demonstrated the Defendant's incompetence.

The Government argues that, after months of competency restoration therapy and several additional evaluations, it is now clear that no accommodations are necessary to ensure the Defendant's ability to stand trial.  The Government relies on the opinion testimony of Dr. Preston Baecht, who explains based on the Defendant's highly successful participation in competency restoration classes, that the Defendant does not need any accommodations at a trial to understand the proceedings and communicate with his lawyer with a reasonable degree of rational understanding.  Thus, according to the Government, the concerns that led to the District Judge's finding of incompetency have been sufficiency resolved, and the weight of the evidence now demonstrates Defendant to be competent.

The Defendant does not expressly dispute the lack of need for accommodations.  Rather, Defendant's position is that he is incompetent regardless of accommodations, because his perseveration over irrational issues renders him unable to abstractly consider the weight and nature of the evidence against him and to make intelligent decisions in the case.  Defendant does not suggest that any

accommodations could assist with this problem, and he adduced opinion testimony from Dr. Flores to that effect. *See* Tr. [106] at 90-91 ("I'm not even sure why you guys are discussing accommodations. Because this is -- this is about two steps before you even consider any type of accommodations.") The position of Defendant's experts, rather, is that "[h]e is not able to really see the information being provided to him in a logical coherent manner," and there was no suggestion from Defendant's experts that accommodations at trial would assist with this. *Id.* Indeed, Defendant's experts opine that Defendant's fixation on particular issues impede their ability to discuss the case with him for hours at a time. In other words, if the issued discussed by Defendant's experts were to constitute incompetency, no accommodations are evident that could resolve such a problem, and Defendant's experts propose none.

Thus, the Court is now proceeding on the largely undisputed premise that Defendant's competency does not actually turn on a slower pace or other trial-related accommodations. The question, rather, turns on whether Defendant's cognitive impairment prevents him from discussing the case with his attorney with a reasonable level of rationality at all. If so, Defendant should remain considered as incompetent. If not, he should be declared competent and subjected to a trial with no particular accommodations.

In assessing this question, the Court notes that a defendant is not necessarily

incompetent simply as the result of mental defects that impact cognition.  *See*

*Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir.1995) (noting that "neither low

intelligence nor mental deficiency" "demonstrates incompetence to stand trial;

rather, the evidence must indicate a present inability to assist counsel or understand

the charges.") (citation omitted).  In determining competency, the district court may

rely on numerous factors, including expert medical opinions and the court's

observation of the defendant's demeanor. *United States v. Long Crow*, 37 F.3d

1319, 1325 (8th Cir. 1994).  This standard does not require that defendants "fully

comprehend the intricacies" of the legal issues in their case, *United States v.*

*Hogan*, 986 F.2d 1364, 1373 (11th Cir. 1993); "have a high level of ability or

performance," or "be as intelligent and reasonable as his lawyers."   *United States*

*v. Merriweather*, 921 F.Supp.2d 1265, 1307, n. 62.  "The 'understanding' required

is of the essentials—for example, the charges, basic procedure, possible

defenses—but not of legal sophistication."  *Robidoux v. O'Brien*, 643 F.3d 334,

339 (1st Cir. 2011) (a defendant's insistence on advancing a frivolous legal

argument, even in a "rambling and (judged by conformity to legal principles)

almost incoherent" pleading, does not itself demonstrate mental incompetency);

*United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003) ("[m]any litigants

articulate beliefs that have no legal support—think of tax protesters who insist that

wages are not income, that taxes are voluntary, or that only foreigners must pay

taxes.... Sometimes these beliefs are sincerely held, sometimes they are advanced only to annoy the other side, but in neither event do they imply mental instability or concrete intellect ... so deficient that trial is impossible.").

Generally, it is the Defendant's burden to prove his incompetence by a preponderance of the evidence. *See United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011) ("[A] petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence.")  Here, the Defendant has already been found to be incompetent  Thus, Defendant argues, although without citing any authority, that the burden should be placed on the Government to "reverse the district court's determination."  The Government, on the other hand, simply cites the general standard that the proponent of incompetency bears the burden of proof, without citing any authority that this burden applies in the instant context.

The Eleventh Circuit does not appear to have specifically addressed the allocation of the burden of proof after restoration efforts of a defendant already found to be incompetent, and the very few jurisdictions to discuss the issue appear to be split.  *Compare Gonzales v. Walker*, 2010 WL 3893577, *15 (N.D. Cal. Sept. 30, 2010) ([t]he fact that [a defendant] was already adjudged incompetent may be a distinction without difference" with regard to the allocation of the burden of proof,

and denying habeas claim based on state conviction, in which the trial court assigned the burden of proof to defendant to show that incompetency remained after restoration efforts); *with United States v. Bergman*, 2011 WL 1793261, *8 (D. Colo. May 5, 2011) ("Having determined that Defendant was not competent in February 2007, the burden is upon the government to prove by a preponderance of the evidence that her competence was restored in October 2007, and thereafter for the May 2008 trial.")

To the extent the Defendant's argument is based on characterizing the restoration determination as a "rever[sal] of the district court's determination," that is inaccurate.  Questioning whether a Defendant remains incompetent after treatment does not implicate a "rever[sal]" of the prior decision, but rather recognizes that competency is a function of a Defendant's abilities at a particular point in time as well as treatment that has been provided.  In any event, in the interests of caution, in light of the lack of clear authority on this question, and because the Government does not specifically address the allocation of burdens in the precise procedural posture of this case, the Court assumes the burden to lie with the Government for purposes of this Report and Recommendation.  As discussed below, the assignment of this burden to the Government does not alter the undersigned's recommendation.

In assessing Defendant's competence post-restoration, the Court relies

substantially on the credible opinions of Dr. Preston Baecht. These opinions are entitled to substantial weight. They are not based on a single evaluation or handful of evaluations. The opinions, rather, are based on several months worth of interactions with Defendant that Dr. Preston Baecht and her staff enjoyed with Defendant while he was placed at their facility for restoration. These interactions occurred in a variety of settings, including interviews, tests, and a nine-week long competency restoration course. Dr. Preston Baecht and her staff also had the first-hand opportunity to observe Defendant's ability to navigate a disciplinary incident, in which he had to address the evidence against himself and handle his own defense. Based on this substantial foundation, Dr. Preston Baecht opined that Defendant is competent to stand trial and that, while accommodations would be helpful to any defendant with mental deficiencies, Defendant does not particularly require accommodations. Gov't Ex. 1 at 14.

To be sure, the competency restoration training that Dr. Preston Baecht oversaw was not focused on the specific facts of Defendant's case. The Court understands that Defendant's experts take primary issue with Defendant's ability to rationally understand and weigh that evidence, and that they do not take issue with Defendant's knowledge of the criminal justice system generally. But Defendant's high level of understanding as to the process and the issues that go into a criminal case at least demonstrate a very strong foundation of knowledge relevant to the

defense of his case.  And, significantly, Dr. Preston Baecht relayed specific

discussions with the Defendant about his case that suggest a fair degree of rational

and strategic thinking:

> What Defendant asserted was that the gun had been found in a trashcan
> and that they were saying it was his gun but that it was not and that they
> would somehow have to prove that he was the one that threw it in the
> trashcan.  He wasn't aware of it having fingerprints on it.  He did
> mention inconsistencies in the police report.  And to him that was
> important.  Whether or not the amount of importance he placed upon it
> was entirely accurate, I don't know.  But . . . his overall contention was
> that he was innocent and that he needed to poke holes in the police
> reports to show that there were problems with those reports and,
> therefore, they couldn't be relied upon as being valid.

*Id.* at 29, 46.  Dr. Preston Baecht's "sense in talking to him was that he was very

motivated to be found not guilty and that he was looking at any little inconsistency

that he could find to try to show that the police officers were lying."  *Id.* at 68-69.

In other words, the Defendant seized on what could rationally be seen as the

key issue in the case, which is the lack of direct proof tying him to the gun that the

officers claim he possessed.  Indeed, because in the absence of fingerprints or other

direct proof, the Government's entire case could rise or fall on the credibility of the

officers.  Thus, the Defendant was highly focused on inconsistencies in the police

report, and recognized that any successful defense must "poke holes with those

reports."  Defendant may have a simplistic, unrealistic and inaccurate view of his

chances of success, the significance of holes he thinks he has poked, or the legal

framework that governs these arguments.  But Dr. Preston Baecht described a
Defendant who is fundamentally aware of the basic legal and evidentiary issues
facing him and is able to articulate basic strategies for defense that are founded in a
reasonable degree of rationality.

Dr. Preston Baecht acknowledged that the Defendant may be placing more
emphasis or hope on certain issues within those reports than may be warranted,
although ultimately Dr. Preston Baecht could not say whether he was or was not.
Nevertheless, it is clear from the Court from the testimony of other witnesses and
from the Defendant's own *pro se* motion that the Defendant has convinced himself
of incorrect legal principles.  Obviously, the "Georgia Constitution" does not
prohibit witnesses from testifying in ways that augment or contradict their police
reports, and the Defendant is legally wrong in insisting otherwise.  But this is not
otherwise some incomprehensible delusion.  The fact is that–while not
constitutionally prohibited–it could be damaging to the credibility of a witness for
him or her to add new material facts to or contradict a report the witness previously
prepared.  And in a case that turns entirely on the credibility of witnesses, seizing
on "any little inconsistency that he could find to try to show that the police officers
were lying" is exactly what most lawyers would look to do.  *Id.* at 68-69.

Notably, although his opinion of his likelihood of success was "fairly
high"–about 80 percent–the Defendant told Dr. Preston Baecht that he was not 100

percent certain that his ideas for his defense would succeed.  Tr. [106] at 32.  While this assessment of his chances at trial may be overly optimistic to a significant degree, it is not uncommon for Defendants to overstate their chances of success, and in any event this demonstrates more flexibility in thinking than what Defendant's experts describe.

Dr. Preston Baecht's assessment of Defendant's understanding of his case was corroborated by her observation of his handling of his disciplinary proceeding. In that proceeding, he coherently represented himself, answered questions relevantly, and wrote letters making clear and rational arguments for leniency and for release from lockdown. *See id.* at 12-13, 26-27.  In the end, the Court finds that Dr. Preston Baecht's analysis and testimony constitutes substantial evidence showing that Defendant's competency has been restored and that he needs no accommodations as originally contemplated by Drs. Dorney and Boutwell.[2]

---

[2] When considered in detail, Dr. Preston Baecht's opinion is not that different from that of the original BOP expert, Dr. Boutwell.  Dr. Boutwell ultimately testified that Defendant is "competent to stand trial," although "he would probably benefit from some accommodations in court."  In other words, "some accommodations I think would be helpful for him, but it was my opinion that he is competent to proceed."  Tr. [43] at 60.  Not dissimilarly, even though she expressly opined that Defendant does not require special accommodations, Dr. Preston Baecht acknowledged that "I think that accommodations would always be beneficial when someone has a lower IQ."  Tr. [106] at 57.  While Dr. Preston Baecht appears to have somewhat more confidence in Defendant's abilities based on his success in the extensive restoration program, there is a core consistency between the opinions of these two experts.

In contrast, the Court has less confidence in the conclusions offered by Drs. Flores and Dorney.  As to Dr. Dorney, the Court continues to harbor the same concerns about the reliability of her opinion as were expressed in the initial Report and Recommendation.  *See* [52] at 17-21.  In sum, Dr. Dorney initially opined that Defendant was competent to stand trial, albeit marginally.  Then, she "shifted" her opinion by the time of the evidentiary hearing.  Tr. [43] at 184.  When cross-examined about this "shift," Dr. Dorney gave the troubling explanation that "I didn't change my mind," but, rather, that her initial opinion that Defendant was competent was based on the assumption that Defendant would plead guilty.  *Id.* at 161 ("If he has to go to trial and he is telling us today he is not willing to enter a plea, then it changes things."), 172-4, 184.  This explanation was and remains troubling to the Court, and revealed a clear inconsistency, because Dr. Dorney's original opinion was that Defendant was competent "to stand trial," not just to enter a plea.  *See* Report and Recommendation [52] at 11.  In other words, Dr. Dorney's testimony appeared to fundamentally alter and contradict her prior written opinion, which contradiction was a substantial negative factor to the Court in weighing Dr. Dorney's reliability.

Moreover, the undersigned in the original Report and Recommendation explained a certain loss of confidence in the standards that Dr. Dorney appeared to be applying.  Specifically, she suggested that Defendant could intelligently and

competently enter a guilty plea despite his alleged perservations, fixations and inability to rationally comprehend and discuss the evidence, but could not competently decide to go to trial. *See id.* at 19. This conclusion was unsettling, because, generally, "a defendant's competence to enter a guilty plea is measured under the same standard applicable to competence to stand trial." *Godinez v. Moran*, 509 U.S. 389, 397-98 (1993). The Court continues to have great difficulty understanding how the result of Defendant's decision as to whether to plead guilty or go to trial, in itself, can or should be considered evidence that he is rationally or irrationally communicating with this lawyer. Surely, if Defendant Spear understands his case rationally enough to waive nearly all of his constitutional rights and agree to a conviction that will likely result in his incarceration for many years, then he also can make the alternative decision to assert his innocence, retain his rights, and make the prosecution prove its circumstantial case. If he, by contrast, is so afflicted by fixations and concrete thinking that he cannot rationally understand and weigh the evidence against him, then surely he cannot intelligently decide to enter a guilty plea either. Dr. Dorney's distinctions between plea and trial therefore made little sense to the Court, which further undermined the Court's reliance on her opinions.

To be sure, Dr. Dorney offered new opinions at the September 2016 hearing, based on a more recent evaluation, including her view that Defendant's limitations

in abstract thinking have worsened.  But the Court's assessment of these new

opinions cannot help but be infected with its strong concerns about how Dr.

Dorney has approached this case.  For that reason, and also because of the greater

amount and diversity of types of interactions within the past year with Defendant

that formed the basis of Dr. Preston Baecht's opinion, the Court resolves the battle

between these two expert opinions in favor of Dr. Preston Baecht.

As to Dr. Flores, her testimony deserves less weight than any of the other

experts who have testified during the course of this case on the question of

competency.  Notably, she expressly disclaimed her role as ***not*** to conduct a

competency evaluation.  While her testimony was helpful, the Court cannot elevate

it over the opinions of Dr. Preston Baecht, who interacted with Defendant over the

course of several months, who interviewed and evaluated him, who oversaw a

comprehensive 9-week long restoration therapy program, who observed his

abilities to handle the defense of an unrelated disciplinary matter, and who (unlike

Dr. Flores) actually offered a formal competency opinion.  Notably, while Dr.

Flores evaluated Defendant over a decade ago (at which point she found him to be

competent), her opinions in the instant case were based on a single evaluation.

Moreover, it appears that Dr. Flores was holding the Defendant to a higher

level than is required by the standards of competency.  She mentioned, for

example, that the Defendant appeared to ascribe significance to the fact that the

Government did not produce any gun or ammunition in evidence at the suppression hearing, but she was concerned that he could not articulate how this could "chang[e] the outcome in [his] case." Tr. [106] at 84.  Similarly, he identified discrepancies in the police reports that he asserted would be a "problem" for the government's case, but did not, in Dr. Flores's opinion, clearly answer how those discrepancies or his view of their significance "would ... have changed the outcome." *Id.*

At the outset, no issue that Defendant brought up with Dr. Flores was delusional, including noting that no physical evidence was produced at the suppression hearing, and his continued focus on inconsistencies in police reports. Whether accurate legally or procedurally, these considerations actually show a focus on the key evidence.  And whether he clearly articulated a lawyerly argument about how his arguments could affect the "outcome," or not, it is obvious that Defendant was focusing on ways to attack the key evidence he anticipated facing, including the police witnesses.  Indeed, Dr. Preston Baecht understood that Defendant was focusing on inconsistencies in the police report in an effort to "poke holes" in witness credibility, in a case that otherwise lacked fingerprints or other direct evidence.  Dr. Preston Baecht thus understood–and it seems obvious to the Court–that Defendant has a belief as to how these issues would help the "outcome" of his case at trial.  Defendant may be legally wrong in a number of these beliefs.

But the courts have made clear in the context of far more frivolous and nonsensical arguments than those espoused by Defendant, that insistence on ridiculous theories "do not imply mental instability or concrete intellect ... so deficient that trial is impossible." *James*, 328 F.3d at 955.

In the end, the Court accepts that Defendant has cognitive limitations that impact his ability to abstractly think, and impact the extent of his understanding. But the question before the Court is whether the weight of the evidence shows Defendant to be able to consider his case and communicate with this lawyer at least at a sufficient level, that is, to a reasonable degree of rationality. Even assuming that the burden of proof on this question has shifted to the prosecution at this juncture, the Court finds that the weight of the evidence supports competency. And in light of the specific, clear and credible testimony of Dr. Preston Baecht, the Court particularly finds that no accommodations, such as slower pace, are necessary.

To be sure, it is not entirely clear to the Court whether the Defendant's competency has been "restored" as the result of the extensive restoration program and other efforts by Dr. Preston Baecht, or whether his participation in this program simply provides more data revealing abilities that he had all along. Ultimately, the question before the Court is the same, which is, is the Defendant competent to stand trial. Because the undersigned answers that question in the

affirmative, it is recommended that Defendant be found **COMPETENT**.

## CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that the Defendant be found to be **COMPETENT TO STAND TRIAL**.  Defendant may re-file the Motion to Suppress previously denied as moot [81] within fourteen (14) days.  Because the evidentiary hearing on that motion occurred during a period of time that may have been prior to the Defendant's restoration of competency, the undersigned believes that the interests of caution dictate that the hearing be held anew.  Thus, the Court's deputy clerk will contact the parties to schedule a new evidentiary hearing on the motion to suppress should Defendant intend to re-file it.

The Court also **DENIES** Defendants' Pro Se Motion For Ineffective Assistance [101].  The testimony at the evidentiary hearing indicated that Defendant had stated he was able and willing to work with his counsel at this time, *see* Tr. [105] at 146, so the motion appears to be moot.  In any event, the concerns raised in the Motion, while not dispositive of his incompetency, do not constitute good cause to justify replacing counsel with other court-appointed counsel.

**IT IS SO RECOMMENDED** this 7th day of December, 2016.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE